***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Phillips and the briefs and arguments of the parties. The appealing parties have not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and the subject matter of this claim.
2. Travelers Indemnity Company of Illinois, a subsidiary of St. Paul Travelers, was the Carrier-Defendant on the risk at the time of the alleged injury or contracting of an occupational disease.
3. Plaintiff was employed by defendant on August 6, 2003.
4. Plaintiff's average weekly wage is $560.00.
5. The parties stipulated that the following documents may be received into evidence without further authentication:
• Stipulated Exhibit 1, Plaintiff's medical records;
 • Stipulated Exhibit 2, Industrial Commission Forms regarding IC file numbers 358807 and 387932;
• Miscellaneous documents stipulated by the parties;
• A videotape.
6. The parties further stipulated that plaintiff was out of work from October 30, 2003 through January 25, 2004.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 Findings of Fact
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 65 years old, and had been employed as a machinist for defendant for a period of approximately eleven years.
2. Plaintiff's regular job duties included but not limited to running machines such as a punch press, a drill press, shearers, lathes, etc. Plaintiff was also required occasionally to perform duties such as operating a forklift or sweeping the floors. Plaintiff's work involved preparation of some paperwork. While approximately 95% of plaintiff's work day was in some way involved in duties related to the machinery in the shop, that time was divided into various tasks such as setting up the machines, going to a work station to pick up product to be run through a machine, operating the machinery, removing product from the machinery, and taking product to other locations.
3. On August 6, 2003, plaintiff duties were operating a shearing machine. Plaintiff's duties, with the assistance of another worker, lifted sheets of metal weighing approximately 30 to 40 pounds, and placed these sheets into the shearing machine. These metal sheets were estimated to be eight feet long and of varying width, from 12 inches to up to two feet. The machine cut the metal sheets into strips which were four inches wide, four to five feet long, and approximately seventy-four one thousands of an inch thick. Plaintiff then removed the cut strips from the shearing machine, and placed them up against a wall, standing vertically. Plaintiff later lifted the sheared strips in order to carry them to the punch press.
4. On August 6, 2003, plaintiff operated the shearing machine in the normal and customary fashion. Plaintiff put his right hand under the strips and his left hand over the metal strips and began to lift, he felt a pop and the onset of pain in his right wrist. Approximately 30 minutes later, the wrist began to swell.
5. On August 6, 2003, plaintiff reported the incident to Bruce Hegler, his supervisor. He later was instructed to go to the doctor. He requested to wait until the following day, to see if the swelling would go down. The next morning, plaintiff's hand was still swollen, so he went to Union Family Medical Center.
6. On August 7, 2003, plaintiff was examined by Dr. Jody Holler at Union Family Medical Center. Dr. Holler performed x-rays which disclosed a 3mm distance between the scaphoid and lunate bones in the wrist. Dr. Holler diagnosed a questionable wrist fracture with a possible scapholunate disassociation. He placed plaintiff's right wrist in a splint, and referred plaintiff to The Miller Orthopedic Clinic for further treatment.
7. On August 8, 2003, plaintiff was examined by Dr. John Meade of The Miller Orthopedic Clinic. Dr. Meade diagnosed plaintiff with chronic scapholunate disassociation with dramatic widening of the scaphoid interval and arthritic changes of the radial carpal articulation, particularly in the scaphoid interval in the scaphoid fossa.
8. Plaintiff returned to Dr. Meade on August 25, 2003, at which time plaintiff was advised that he could continue to perform full duty work.
9. On September 29, 2003, Dr. Meade recommended continued use of anti-inflammatory medications. He advised if plaintiff's symptoms worsened and persisted, a wrist fusion would be recommended.
10. On October 29, 2003, plaintiff reported that he was experiencing limitations with his activities of daily living. Dr. Meade diagnosed end stage degenerative disc disease of the right wrist, and recommended surgery.
11. During his deposition, Dr. Meade opined that plaintiff essentially had very symptomatic long-standing degenerative changes of his wrist that were not doing well. On October 30, 2002 Dr. Meade performed a right wrist fusion with dorsal plating and a bone graft. His postoperative diagnosis was severe degenerative disc disease of the right wrist. Following his surgery, plaintiff continued under Dr. Meade's care. Treatment included splinting and physical therapy. On January 12, 2004, Dr. Meade advised that the wrist fusion had healed. He released plaintiff to return to modified duty work on January 26, 2004, involving no lifting of greater than 15 pounds with the right hand. Plaintiff returned to work for defendant on January 26, 2004. On March 2, 2004, Dr. Meade rated plaintiff with a 30% permanent partial disability of the right hand and released him at Maximum Medical Improvement.
12. During his deposition, Dr. Meade could not answer to a reasonable degree of medical certainty that plaintiff's employment exposed him to a greater risk of contracting the condition for which he was treated.
13. Dr. Warren Burrows performed an Independent Medical Records Review. Dr. Burrows is an expert in the fields of orthopedic hand surgery and the treatment of upper extremities, and he is board certified in hand, wrist, and upper extremity surgery. Dr. Burrows confirmed that Plaintiff was in fact suffering from chronic wrist instability secondary to scapholunate disassociation with advanced arthritis of the right wrist resulting from a past specific trauma and an arthritic process, which gradually developed over time, as a part of the natural progression of that condition.
14. William T. McClure, Jr. has a masters degree in exercise physiology and is a certified work capacity evaluator and a certified ergonomic evaluation specialist. He has over 22 years experience in the field of ergonomics. Mr. McClure observed the operation of the machines in the machine shop, and the operations which Mr. McClure observed accurately and fairly reflected plaintiff's normal job duties. Mr. McClure observed plaintiff's work functions, and measured the amount of force required to operate the machinery, time elements, motion measurements, and repetitive versus rest work cycles. At the time Mr. McClure made his observations and measurements, plaintiff was present and provided descriptions of the jobs as well as demonstrations of both the job requirements and the events leading up to his August 6, 2003 incident. Mr. McClure made the determination that there were no ergonomic factors on the job or in the activities which plaintiff was performing when he felt the popping in his wrist, which would have caused or contributed to his wrist conditions. The various machines and cranks, which plaintiff operated in performing set up and operation of the machines, did not require extensive or unusual force or exertion. Plaintiff's job duties represented low exposure to the development of musculoskeletal and cumulative trauma disorders. The ergonomic factors present at plaintiff's job did not present any exposure to chronic or repetitive injuries of the wrist.
15. Upon review of all the deposition testimonies submitted to the undersigned, greater weight is given to the professional opinions of Dr. Burrows and Mr. McClure. The undersigned finds that the August 6, 2003 incident described by plaintiff did not cause the ligament tear, which had occurred prior to plaintiff's incident of August 6, 2003, nor did the incident of August 6, 2003 aggravate or cause the arthritis in plaintiff's right wrist. Plaintiff's job as a machinist did not place plaintiff at an increased risk of developing a scapholunate disassociation as opposed to members of the general public, nor was it a significant causal factor in the development of his scapholunate disassociation or arthritis.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff did not sustain an injury by accident on August 6, 2003. While he experienced the onset of pain while working, the activity he was performing which precipitated his symptoms was a part of his normal work routine, which plaintiff performed in the normal and customary manner. N.C. Gen. Stat. § 97-2(6).
2. Upon review of the evidence presented in this case along with the medical evidence in its entirety, plaintiff has failed to prove by the greater weight of the evidence that plaintiff's employment placed him at an increased risk in developing scapholunate disassociation, degenerative disc disease, arthritis and other symptoms in his right wrist for which he was ultimately treated for. Plaintiff has failed to prove by the greater weight of the evidence that his employment as a machinist for defendant was a causal factor in the development of those conditions. N.C. Gen. Stat. § 97-53(13).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff has failed to meet his burden of proving an injury by accident or occupational disease. Accordingly, plaintiff's claim must, and is hereby, DENIED.
2. Defendants shall pay an expert witness fee in the amount of $390.00 to Dr. John Meade, $390.00 to Dr. Warren Burrows. An order has previously been entered with respect to an expert witness fee for Bill McClure.
3. Defendants shall pay the cost due the Commission.
This the 13th day of October 2005.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER